UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NIKOLI MARSHALL,

                    Plaintiff,

         v.                                                    Case No. 15-C-1300

NANCY BERRYHILL,
Acting Commissioner of Social Security,

                    Defendant.

## DECISION AND ORDER

When is the aggressive, angry, indolent and disobedient behavior of a teenager, or an adult for that matter, willful and when is it the product of a severe mental impairment or developmental disability? Modern social sciences claim to have the expertise to provide the answer, though unlike the hard sciences, they offer no empirical proof for the answers they provide and those who work in the field, as this case demonstrates, show little agreement even among themselves. This is an action for judicial review of a decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Following a hearing before an Administrative Law Judge (ALJ), Jacqulyn Waggoner's application for supplemental security income on behalf of her son, Plaintiff Nikoli Marshall, was denied. Marshall attained the age of 18 prior to the final determination and his claim was evaluated under both the child and adult disability standards. Marshall asserts that the Commissioner's decision should be remanded for further proceedings because the ALJ made multiple errors in his determination that Marshall was not disabled. For the reasons that follow, the Commissioner's decision will be reversed and remanded.

## BACKGROUND

On December 15, 2011, Jacqulyn Waggoner filed an application for supplemental social security income on behalf of her son, Nikoli Marshall. R. 95. Waggoner alleged that Marshall suffered from obsessive compulsive disorder (OCD), bipolar disorder, and attention-deficit/hyperactivity disorder (ADHD), with an alleged onset date of May 1, 2003. R. 268. Marshall was born on May 30, 1995, making him 7 years old at the time of his alleged onset date. He turned 18 on May 30, 2013, while his disability claim was pending.

As part of Marshall's ongoing treatment, psychiatrist Dr. Carlos Castillo began providing treatment on August 12, 2009. R. 676. Waggoner requested an appointment in February 2010 to address Marshall's explosive behavior. R. 612. At the time, Marshall's diagnoses included mood disorder-not otherwise specified (NOS), generalized anxiety disorder, and ADHD, combined type. *Id.* Dr. Castillo increased Marshall's dosage of vyvanse and depakote and maintained the dosage of wellbutrin and risperdal. *Id.* Marshall returned on February 8, 2010, where Waggoner reported he appeared to be doing better in school, but remained irritable at home. R. 610.

Dr. Castillo continued to treat Marshall throughout 2011. On July 29, 2011, Dr. Castillo added oppositional defiant disorder to the list of his diagnoses. R.445. He observed that Marshall was "highly symptomatic, irritable, snappy, and certainly physically aggressive." R. 446. In August 2011, Dr. Castillo noted during that session that Marshall was pleasant and had good eye contact, but added a diagnosis of Rule out Asperger's disorder. R. 441. Waggoner reported in October 2011 that Marshall was doing well in school and felt he was acting like a typical teenager. R. 438. However by December, Marshall was getting mostly D's and C's in school and was struggling to turn in his homework, though his behavior at home was good. R. 436.

2

The Ashwaubenon School District completed an evaluation report and individualized education plan (IEP) for Marshall in November 2011. R. 531–54. The IEP was designed to cover Marshall's special education schooling from October 2011 until October 2012. R. 531. The report indicated Marshall was first evaluated as having an emotional behavior disability in the third grade and was diagnosed with ADHD at the age of 7. R. 533. Although Marshall says he wants to do well in school, Waggoner reported he requires assistance to complete his work. *Id.* The IEP set out three target behaviors: (1) improve responsibility for assignment completion and turning in work in a timely manner; (2) improve ability to stay on task; and (3) improve organizational skills. R. 552–54.

Marshall's anger issues appeared to return in 2012. Marshall and his parents indicated in March that he has been struggling with worsening temper outbursts. R. 434. Waggoner continued to observe Marshall's irritability and snappiness. R. 432. Marshall broke a car window in May during a temper tantrum. R. 425. Dr. Castillo referred Marshall to Dr. Eric Lund for evaluation of the rule out Asperger's diagnosis. R. 502–03.

Dr. Lund conducted a psychological evaluation on May 31, 2012 to help differentiate Marshall's several diagnoses. R. 466–68. He concluded that Marshall would most accurately be diagnosed with schizophrenia–undifferentiated type. R. 468. Dr. Lund based this conclusion upon Marshall's childhood problems with hearing auditory hallucinations and experiencing significant paranoia unrelated to his mood state. He noted that Marshall has been treated with anti-psychotic medications since that time, which would explain why his psychotic symptoms have been absent. Dr. Lund also indicated the negative symptoms of schizophrenia often look similar to Asperger's Disorder: affect flattening, alogia, and avolition. He observed Marshall's facial expressions were

3

somewhat unresponsive, he showed poor eye contact and reduced body language, and his emotional expressiveness was diminished. Dr. Lund concluded that schizophrenia was a better diagnosis than Asperger's due to the childhood manifestation of psychotic symptoms. Dr. Castillo reviewed Dr. Lund's assessment on June 25, 2012 and expressed his disagreement with the schizophrenia diagnosis due to Marshall's life-long poor social functioning. R. 504. On July 6, 2012, Dr. Castillo replaced his diagnosis of rule out Asperger's with pervasive developmental disorder (PDD). R. 506.

On June 30, 2012, Marshall underwent a consultative psychological evaluation by Dr. Robert Schedgick on referral by the Wisconsin Disability Determination Bureau. R. 471–85. At the time, he was a senior in high school. R. 475. Dr. Schedgick did not observe any emotional displays of inappropriate behavior. R. 472. He noted that Marshall's affect appeared "bright and appropriate. He is very socially engaging and pleasant. He is cooperative and polite. He is a nice young man. He laughs and smiles quite easily." R. 478. Dr. Schedgick also concluded that Marshall did not appear to have significant difficulties in focusing and concentrating. R. 476. Although Marshall has some difficulty recalling the exact date, Dr. Schedgick concluded he appeared oriented. R. 477. Marshall could wash, dress, cloth, bathe, shower himself, do his own laundry, cook, and clean. R. 481. He also reported watching the television show "Sponge Bob," playing video games and working on a computer and said he would do them 10 hours a day if he could. R. 474. Dr. Schedgick thought Marshall would need some assistance in being able to rent an apartment and that making the transition to adulthood would be problematic for him, which "would not be unusual." R. 483. He diagnosed Marshall with Oppositional Defiant Disorder, a history of diagnosis of mood disorder NOS, and a history of learning disorder NOS. R. 482–83. He also noted that he would need more evidence in order to conclude that Marshall has Asperger's syndrome. R. 482. Finally, Dr.

4

Schedgick concluded that Marshall continues to need some kind of assistance, monitoring, and supervision. R. 484.

State agency psychologist Michael Mandli, Ph.D., concluded on July 9, 2012 that Marshall's alleged autistic/other pervasive developmental disorders were nonsevere. R. 91. Dr. Mandli evaluated the six childhood domains and found: (1) Acquiring and Using Information—Less than marked; (2) Attending and Completing Tasks—Less than marked; (3) Interacting and Relating With Others—Less than marked; (4) Moving About and Manipulation of Objections—No Limitation; (5) Caring For Yourself—No Limitation; and (6) Health and Physical Well-Being—No Limitation. R. 91–92. Based upon the six domains, Dr. Mandli concluded that Marshall's impairments do not functionally equal a listing. R. 92. State agency psychologist Kyla King, Psy. D. reviewed Marshall's record and agreed with Dr. Mandli's conclusion—Marshall's impairments do not functionally equal a childhood listing. R. 104. Dr. King slightly differed from Dr. Mandli's evaluation of the six domains and concluded that Marshall demonstrated a marked limitation in the domain of attending and completing tasks. R. 103.

Marshall was seen by Dr. Kim Lasecki, a licensed psychologist, on August 29, 2012, at the request of Dr. Castillo for a psychological evaluation. R. 511. Dr. Lasecki noted that "[s]ince the patient was quite young he has experienced significant psychiatric symptoms of anxiety, possible thought disorder, and symptoms out of raise concern [sic] regarding the possibility of pervasive developmental disorder features." *Id.* His diagnostic impressions were mood disorder NOS with predominantly depressed mood and dysthymic features, generalized anxiety disorder, history of panic disorder with agoraphobic features, history of ADHD inattentive type, and history of Asperger's disorder/PDD NOS. R. 514. On September 26, 2015, Dr. Lasecki conducted a five hour

5

psychological evaluation. R. 519–23. Marshall's scores revealed overall intellectual functioning within the low average range. R. 523. His intellectual profile also raised a concern for the possibility of a non-verbal learning disability. *Id.* After the evaluation, Dr. Lasecki diagnosed Marshall with mood disorder with predominately depressive features, ADHD, pervasive developmental disorder–NOS, generalized anxiety disorder, and a possible non-verbal learning disorder. *Id.*

Marshall also underwent weekly, two-hour home-based therapy sessions with psychotherapist Linda Carmody, MS, LPC from late August 2012 until March 2013. R. 673–75. Ms. Carmody started with a diagnosis of Mood Disorder–NOS so that she could eventually determine if Marshall's symptoms arose from anxiety, bipolar, depression, or a developmental disorder. R. 675. On February 15, 2013, after more than 30 hours of treatment, Ms. Carmody ruled out Oppositional Defiant Disorder. R. 557. She concluded that the "underlying cause of behavior problems and functional impairments likely stem from a developmental disorder, such as Autism Spectrum Disorder, Asperger Disorder or Pervasive Developmental Disorder, NOS." *Id.* Marshall's final home-based outpatient session was on March 14, 2013. R. 649. Ms. Carmody again noted the in-home sessions ended because the underlying cause of the behavior problems arose from a developmental disorder and gave a provisional diagnosis of Pervasive Developmental Disorder–NOS. R. 648. Marshall turned 18 on May 30, 2013.

In early June, Dr. Irma Casey Smet conducted a two day comprehensive neuropsychological evaluation in response to a referral by Dr. Castillo so as to aid in diagnostic clarification and treatment planning. R. 634–46. Dr. Smet administered two different IQ tests: Wechsler Abbreviated Scale of Intelligence and Stanford-Binet Intelligence Scales–Fifth Edition. R. 635. The latter test was given because Dr. Smet noted it would offer a better estimate due to Marshall's history of

6

special education and lifelong difficulties. R. 637. The Stanford-Binet test resulted in a full score IQ of 64. R. 642. Dr. Smet also concluded that Marshall "presents with cardinal symptoms of Asperger's disorder, as well as certainly a history of some depression with manic episodes." R. 640. She opined that the evaluation results are most consistent with Asperger's disorder. *Id.* Dr. Castillo added Asperger's disorder to his list of diagnoses on June 25, 2013. R. 712. Dr. Castillo opined that Marshall's concrete thinking and lack of planning towards the future indicated that he would require ongoing adult supervision in both a vocational and residential setting. R. 676.

Marshall began a temporary work experience at St. Vincent de Paul on June 17, 2013 through the Wisconsin Department of Vocational Rehabilitation. R. 368. The purpose of the experience was to provide Marshall an opportunity to assess and practice work skills and behaviors. R. 342. Marshall worked 20 hours a week. R. 368. His supervisor indicated that he was very happy with Marshall's work. *Id.* However, Marshall left work early a few days during the program because he was unable to read the analog clock. R. 367. Marshall's temporary work experience ended on August 9. Marshall overall did well but "there were a few situations where it was noticed that he struggles and needs assistance with asking questions and knowing when to ask those questions and how to do that." *Id.*

Marshall began seeing Ms. Carmody again on an outpatient basis in the latter half of 2013. She added Asperger's Disorder as Marshall's primary diagnosis following Dr. Smet's evaluation and noted that subsequent treatment will focus on "reducing effects pertaining to Asperger Disorder." R. 711. Marshall reported in September that he was searching for a full time job, attending Asperger's adult support groups, and has made friends. R. 710. Ms. Carmody observed that Marshall's "inability to see the 'big picture' (certainly a hallmark of autism) continues to prove to

7

be pervasive." R. 709.

Marshall's symptoms seemed to improve in late 2013. Marshall began seeing Brian Cagle, Psy.D. in September 2013. R. 719. Dr. Cagle's diagnoses only listed bipolar disorder–NOS and generalized anxiety disorder. R. 720. Throughout Dr. Cagle's treatment, he did not make any reference to Marshall's previous diagnosis of Asperger's disorder. R. 720, 730–33. Marshall began seeing a new psychiatrist, Dr. Naciye Kalafat, in October. R. 721–22. Although she included Asperger's disorder in the list of diagnoses, Dr. Kalafat agreed to reduce his medication dosage. R. 725. After the reduction, Marshall felt more alert, less dopey, and was able to tolerate the medication decrease without any mood symptom exacerbation. R. 726.

On April 18, 2014, ALJ Wayne L. Ritter held a hearing to determine whether or not Marshall was disabled. R. 45–86. Baker, Waggoner, and a vocational expert (VE) testified. *Id.* At the outset, the ALJ discussed Marshall's Asperger's diagnosis. R. 51. The ALJ understood the medical record to suggest that Dr. Castillo and Ms. Carmody were the only two to ever recognize an Asperger's diagnosis, that Dr. Castillo over-medicated Marshall, and that Dr. Cagle and Dr. Kalafat dropped the Asperger's diagnosis in late 2013. R. 51–52. Marshall then testified that he had part time work experience at St. Vincent de Paul and for his family's dog kennel business. R. 52–58. He works two and a half to three hours a day for the dog kennel business, seven days a week. R. 55–56. He only got days off when they have kennel help, which means he normally works three days a week. R. 56–57. Marshall has been helping the business for the past fifteen years. R. 57. He also testified that he was in special education classes and graduated from high school. R. 59. Marshall helped out around the house by vacuuming, taking care of pets, and cleaning bathrooms. R. 60. He spends an average of nine hours a day playing video games and watching television. *Id.*

8

He tried to apply for technical college but was unable to complete the application because he got stressed. R. 79. Marshall applied for jobs with the help of his mother and step-father, but has been unsuccessful in his search. R. 80.

Ms. Waggoner, Marshall's mother, also testified. She reported that she has to wake up Marshall in the morning, make sure he puts on clean clothes and showers, give him his medication, make sure that he takes his medication, ensure he eats breakfast/lunch/dinner, and make sure he goes to bed. R. 70–71. Waggoner testified that Marshall does not possess a good reference of time. R. 71. She categorized Marshall's presence at the dog kennel business not as the source of extra help, but as a way to prevent him from constantly calling her at work and asking when she would be coming home. R. 76. She denied that Marshall ever worked at the kennel for 14 days straight. R. 77. Waggoner testified the reason Marshall applied for jobs and for college was because he wanted to be "normal." *Id.* The VE testified that jobs exist in the national economy for an individual with Marshall's age, education, and work experience who is able to perform work with no exertional limitations, but is limited to: work involving no more than simple, routine, repetitive tasks; no fast paced production requirements; only simple work-related decisions; no more than occasional workplace changes; and limited to no more than occasional interaction with public, co-workers, and supervisors. R. 82. Additionally, the VE testified that 10% off task during the workday would be the maximum tolerance. R. 84.

In a 19-page decision issued on June 26, 2014, the ALJ determined that Marshall was not disabled and denied his application for children's and adult SSI benefits. R. 18–36. The ALJ first considered Marshall's childhood disability claim. He found that before attaining age 18, Marshall had the following severe impairments: affective disorder, anxiety disorder, ADHD, and personality

9

disorder. R. 23. The ALJ considered Asperger's syndrome, but noted that subsequent treatment records abandoned the diagnosis and there was insufficient evidence for Asperger's to be a medically determinable impairment. *Id.* The ALJ determined that before attaining age 18, Marshall did not have an impairment or combination of impairments that functionally equaled the listings 20 C.F.R. §§ 416.924(d) and 416.926a. R. 23. In determining the severity of Marshall's disorders, the ALJ considered the six domains of functional equivalence for children under § 416.926a. R. 26–30. The ALJ concluded because "the claimant did not have an impairment or combination of impairments that resulted in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning . . . the claimant was not disabled before attaining age 18." R. 31.

The ALJ then addressed Marshall's adult disability claim. *Id.* The ALJ found Marshall had not developed any new impairment or impairments since attaining age 18. *Id.* He once again considered the treatment records' mention of Asperger's syndrome, but found it did not best represent the impairments experienced by Marshall during the relevant period. *Id.* The ALJ determined that Marshall's medical impairments did not meet or medically equal the criteria of listings 12.04, 12.06, and 12.08. *Id.* In determining the severity of Marshall's disorders, the ALJ considered whether the "paragraph B" criteria were met. *Id.* The ALJ found that Marshall had a moderate restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation which have been of extended duration. R. 31–32. The ALJ assigned a residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: "he is limited to simple, routine, and repetitive tasks with no fast-paced work and only simple, work related decisions with only occasional workplace changes. He is further limited to

10

occasional interaction with coworkers, supervisors, and the public." R. 33. The ALJ found that Marshall's allegations of total disability were not fully credible. *Id.* He also found Dr. Castillo's opinion and Waggoner's functional assessment only worthy of limited weight. R. 33–34. Finally, the ALJ concluded that considering Marshall's age, education, work experience, and residual functional capacity, he is capable of making a successful adjustment to other work. R. 35.

Based on these findings, the ALJ concluded that Marshall was not disabled within the meaning of the Social Security Act prior to attaining age 18 nor after attaining age 18. *Id.* The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Marshall's request for review on September 8, 2015. R. 1. Marshall then commenced this action for judicial review.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not

11

substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *§ v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. IQ Scores and Listed Impairments

Marshall first claims that the ALJ failed to evaluate all of his IQ scores, and in doing so, failed to properly determine whether Marshall's impairments, alone or in combination, met or equaled any listed impairment. In determining childhood disability, the ALJ must determine whether the claimant has an impairment that meets or medically equals a listing in the Listing of Impairments or functionally equals the listings. 20 C.F.R. §§ 416.924, 416.926a; SSR 09-1p. The child is then deemed disabled if the impairments result in "marked and severe functional limitations." 20 C.F.R. § 416.906. Adult claimants will be deemed disabled if they meet or equal a listing without considering age, education or work experience. 20 C.F.R. § 416.920(d). Childhood Listing 112.05D is met when the claimant has a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 112.05. Listing 12.05C for adults meanwhile is met when the claimant has a valid IQ score between 60 and 70, and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § Pt. 404, Subpt. P, Listing § 12.05C.

Dr. Irma Smet conducted neuropsychological testing with Marshall on June 5 and 6, 2013,

12

which included two separate IQ tests. R. 634. Dr. Smet noted that "[d]ue to Nikoli's special education, [sic] lifelong difficulties, we did give him the Stanford-Binet 5th edition, which again tends to be a better estimate in individuals with similar problems of their IQ." R. 637. The Stanford-Binet test resulted in a full score IQ of 64—which placed Marshall in the mildly intellectually disabled range. (R. 642.) However, this IQ score was lower than others conducted, including the other test conducted by Dr. Smet. Marshall did not score between 60 and 70 on any of the other IQ tests he took. Dr. Smet's testing occurred after Marshall turned 18.

ALJs have the right to reject IQ scores as invalid. *Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007). In order to do so, however, the ALJ must provide adequate reasoning that the score is invalid and is inconsistent with the record. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992). Here, not only did the ALJ fail to provide adequate reasoning for why he discounted Dr. Smet's IQ score, the ALJ failed to discuss any of Dr. Smet's findings other than a passing mention of how her testing noted the presence of cardinal symptoms of Asperger's in Marshall. R. 31. The Commissioner claims that any error in the ALJ's lack of discussion of the Stanford-Binet IQ score of 64 is harmless because Plaintiff has failed to show that Dr. Smet's testing establishes that he meets or equals any of the Listings. The Commissioner asserts that simply because Dr. Smet prefers the Stanford-Binet 5th edition testing does not mean that the test should be preferred for the purposes of meeting the listing requirements.

The ALJ's failure to discuss the IQ score or why it was discounted necessitates remand regarding Marshall's alleged disability. Neither Listing 112.05D, nor Listing 12.05D require a single IQ score be preferred over others for the purposes of the listing requirements—they only require "*a* valid verbal, performance, or full scale IQ of 60 through 70." (emphasis added). As Dr. Smet's

13

Stanford-Binet IQ score is a valid IQ score, the ALJ was required to discuss the score and either explain why he rejected it or proceed to the next step in the test to determine if Marshall met or equaled one of the Listings. The ALJ failed to do so.

The Commissioner asks the court to find any error harmless because "Plaintiff has failed to show that Dr. Smet's neurological testing establishes that he meets or equals Listing 12.05 or Listing 112.05." Def.'s Br. at 7. In other words, what the Commissioner appears to be arguing is that because Dr. Smet did not go on in her report to find that Marshall also met the other criteria for those listings, the ALJ's failure to address the IQ score she found was irrelevant. But the ALJ found on the basis of other evidence in the record that Marshall did meet the other criteria. The ALJ found that he had other mental impairments – namely, affective disorder, anxiety disorder, attention-deficit hyperactivity disorder, and personality disorder – that imposed "additional and significant limitations on function," as required for Listing 112.05D, and "additional and significant work-related functions," as required for Listing 12.05D. R. 23. Given these findings, I cannot say that the ALJ's failure to address Dr. Smet's findings was harmless. Nor is the evidence so overwhelmingly clear that I can say the ALJ would not reach a contrary decision. Accordingly, for this reason alone, the Commissioner's decision must be reversed and the case remanded.

**B. Child Functional Equivalence Assessment**

Marshall next claims that the ALJ failed to properly evaluate his functional equivalence prior to reaching the age 18. In order to determine the functional equivalence for children, the ALJ must evaluate the claim under six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

14

A child's impairments functionally equal a listing if there is a marked limitation in at least two domains or an extreme impairment in one domain. 20 C.F.R. § 416.926a(d).

Marshall argues the ALJ improperly found a less than marked limitation in acquiring and using information, interacting and relating with others, and caring for yourself. Specifically, Marshall claims that the ALJ cherry-picked evidence to support his findings by not discussing, among other things, Marshall's lower IQ scores, lack of social skills, and inability to care for himself. As the ALJ found Marshall's impairments resulted in a marked limitation in the domain of attending and completing tasks, a second marked limitation under one of the remaining five domains would result in Marshall's impairments functionally equaling a listing.

The Commissioner asserts the ALJ's finding of a less than marked limitation in the three domains is supported by substantial evidence. Regarding the domain of acquiring and using information, the ALJ discussed Marshall's presence in special education classes and poor grades, but also that Marshall reported academic improvement in late 2012. R. 27, 520–21. The ALJ considered Dr. Schedgick's June 30, 2012 psychological evaluation where he noted only mild difficulties in focusing and concentrating. R. 27, 484. As to the domain interacting and relating with others, the ALJ noted Marshall's difficulties in making friends, but also found that he was active in the school play, music, and band. R. 28, 533, 540. Finally in the domain of self-care, the ALJ found that Marshall was able to perform independent activities, but still required minimal supervision. R. 29–30, 473, 483. As noted by the Commissioner, the State Agency psychologists that reviewed Marshall's records in July 2012 and December 2012 found that Marshall had either a less than marked limitation or no limitation in the three domains at issue. R. 90–92, 102–04. The ALJ afforded Dr. King's assessment greater weight than Dr. Mandli's because the evidence supported

15

a finding that Marshall had a less than marked limitation in self-care, not no limitation, arising from Marshall's history of tantrums and obsessive behavior. R. 25–26.

While Marshall might have weighed the evidence differently, I cannot say that the ALJ's finding is not supported by substantial evidence. The ALJ did not err in finding a less than marked limitation in acquiring and using information, interacting and relating with others, and caring for yourself. Marshall was able to drive a car, use a computer, and showed improved educational performance in his classes, all tasks that demonstrate an ability to acquire and use information. True, he complained of having no close friends, but there was no showing that he could not make friends, and as the ALJ noted, the IEP for school described him as "very easy going and approachable, noting that he was active in school play, music, and band. R. 28 (citing R. 540). He also seemed to interact appropriately with his parents, therapists and professionals who dealt with him. In sum, the ALJ's assessment of Marshall's behavior in each of the six domains was reasonable and supported by substantial evidence.

## C. Assessment of Medical Evidence

Marshall argues that the ALJ failed to accord sufficient weight to the opinion of Dr. Carlos Castillo, his treating physician, failed to properly address the diagnosis of Asperger's disorder, and failed to consider the opinion of his licensed therapist, Linda Carmody.

### 1. Dr. Castillo

Under the "treating source rule," a treating source's opinion is entitled to "controlling weight" if it is adequately supported by objective medical evidence and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). If the ALJ discounts a treating physician's opinion, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d

16

744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 531 F.3d 606, 608 (7th Cir. 2008). The ALJ must then determine the opinion's weight using the factors listed in 20 C.F.R. § 404.1527(c), including the "length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Campbell*, 627 F.3d at 307 (quoting *Larson*, 615 F.3d at 751). The ALJ is not required to "explicitly weigh every factor." *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 414–16 (7th Cir. 2008). Rather, the ALJ need only "sufficiently account for the factors." *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013). An ALJ need only "minimally articulate" his reasoning for the weight he assigns to a physician's opinion. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Here, the ALJ gave "limited weight" to the opinion of Dr. Carlos Castillo. R. 33. Dr. Castillo opined that Marshall required adult supervision in both a vocational and residential setting. R. 676. As a treating physician who served as Marshall's psychiatrist and treated him fairly regularly for four years, Dr. Castillo's opinion would be entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2). The ALJ concluded that Dr. Castillo's opinion was only entitled to limited weight in part because Marshall noted improvement when his medication dosage was reduced and that Marshall reported a high level of work activity.

In particular, the ALJ found that Dr. Castillo's opinion was inconsistent "with the level of mental function later Dr. Castillo himself identified, including 'no overt signs or symptoms' of a formal though [sic] disorder with normal memory and only mildly impaired insight and judgment." R. 33 (citing R. 720). The ALJ stated that the observed mild nature of Marshall's impairments was

17

in conflict with the GAF score Dr. Castillo purportedly assigned during that visit and with Dr. Castillo's opinion as a whole. However, the mental function and GAF score evidence the ALJ cites to show Dr. Castillo's opinions were inconsistent did not originate from Dr. Castillo—they were taken from the report dictated by Dr. Cagle and reflect the behavioral observations made by Dr. Brian Cagle on September 16, 2013.

Additionally, Dr. Castillo's opinion is not inconsistent with the other evidence the ALJ cites. Although Marshall worked for his family dog kennel and engaged in an 8-week supervised work experience through the Wisconsin Department of Workforce Development, his level of work activity did not necessarily demonstrate he would be able to work full time without adult supervision. Nor is the reported improvement following a medication dosage decrease inconsistent with Dr. Castillo's opinion that Marshall would need ongoing adult supervision at work and in home. These errors cast the ALJ's assessment of Dr. Castillo's opinions in doubt. On remand, the ALJ should properly assess the weight assigned to Dr. Castillo's opinion.

### 2. Asperger's Diagnosis

Also relevant to the issue of the ALJ's evaluation of treating source opinions is the extent to which the ALJ considered Marshall's Asperger's diagnosis. The ALJ concluded that affective disorder, anxiety disorder, ADHD, and personality disorder best represented Marshall's impairments, but that Marshall's Asperger's disorder was not a medically determinable impairment. R. 23. The ALJ made several findings regarding Marshall's alleged Asperger's: 1) Dr. Castillo diagnosed Marshall with Asperger's in mid-2013; 2) Dr. Kalafat later abandoned the diagnosis and decreased Marshall's medication; 3) Dr. Cagle ignored the Asperger's diagnosis in his assessment in 2014; and 4) that prior to the diagnosis, consulting physician Dr. Schedgick noted insufficient evidence for an

18

Asperger's diagnosis. R. 23.

What is missing from the ALJ's decision, however, is any discussion of the opinion of Dr. Smet, the psychologist who examined Marshall at Dr. Castillo's request in early June 2013. Dr. Smet specializes in neuropsychology and conducted a two day comprehensive neuropsychological evaluation of Marshall. She opined that Marshall "presents with cardinal symptoms of Asperger's disorder, as well as certainly a history of some depression with manic episodes." R. 640. Dr. Smet also opined that the evaluation results are most consistent with Asperger's disorder. *Id.* Though the ALJ briefly noted that "physicians in mid-2013 again noted 'cardinal symptoms' of Asperger's," R. 31, he did not address Dr. Smet's multi-day evaluation of Marshall's condition or Dr. Smet's opinion that the evaluation results were consistent with Asperger's.

The Commissioner asserts any error in the ALJ's consideration of Marshall's Asperger's disorder was harmless because he considered the diagnosis and notations in the record evidence. But this assumes Asperger's syndrome has the same etiology as anxiety disorders or any of the other mood or personality disorders that were suggested, an assumption not borne out by the record. Moreover, Dr. Smet's evaluation and opinions regarding Asperger's constitutes important evidence on the issue that merited greater attention by the ALJ than it apparently received. The error was not harmless because the weight assigned to Dr. Smet's opinions would directly affect whether Dr. Castillo's opinions were inconsistent with the medical record evidence, and thus whether Dr. Castillo's opinions were entitled to controlling weight. The ALJ also appears to misstate Dr. Kalafat's opinions regarding Marshall's Asperger's—the medical evidence the ALJ cites as proof Dr. Kalafat abandoned the diagnosis was actually Dr. Cagle's progress notes. R. 730–31. Although Dr. Kalafat reduced Marshall's medication, she continued to list Asperger's disorder as one of

19

Marshall's diagnoses and did not clearly abandon the diagnosis. R. 721–29. On remand, the ALJ should re-evaluate whether Asperger's disorder is a medically determinable impairment through a reassessment of Dr. Smet and Dr. Kalafat's opinions.

### 3. Linda Carmody, MS, LPC

Marshall asserts the ALJ erred by failing to consider the opinions of Linda Carmody, Marshall's psychotherapist. Although a licensed therapist is not considered an "acceptable medical source" for the purpose of establishing an impairment, the ALJ may evaluate a therapist's opinions based on the same kinds of factors used to evaluate acceptable medical sources. SSR 06-03p. A therapist's opinion can be given some weight, especially where it is based on long and frequent contact with the claimant and is consistent with acceptable medical sources who are also treating the claimant. *See Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010) ("Although the opinions of other medical sources are important and should be considered when evaluating 'key issues such as impairment severity and functional effects,' their findings cannot 'establish the existence of a medically determinable impairment.'" (quoting SSR 06-03p)).

Here, Ms. Carmody completed a Disability Assessment Schedule on April 16, 2014 in which she opined that Marshall suffered severe to extreme difficulties in 32 out of 36 activities. R. 745–46. Ms. Carmody provided Marshall with in-home therapy for a year before continuing to treat him in an outpatient setting. Her assessment largely appears consistent with Dr. Castillo's opinion that Marshall required adult supervision in both a vocational and residential setting. While the ALJ did not discuss Ms. Carmody's Disability Assessment Schedule in his decision, he did address a nearly identical version of the form completed by Marshall's mother and signed by Ms. Carmody. R. 34. The ALJ assigned the assessment little weight based upon Marshall's work history and the less than

20

credible testimony of Marshall's mother. Based upon the similarities of the forms, the Commissioner asserts that any error is harmless and that the same reasons the ALJ gave for discounting Waggoner's form applies to Carmody's.

This assertion is erroneous. The ALJ discounted Waggoner's form in part because he found her testimony at the hearing less than fully credible. Given her close personal relationship as Marshall's mother, it is natural to question her objectivity, though it is also true that a mother knows her child better than anyone else. Ms. Carmody, on the other hand, was not related to Marshall and did not testify at the hearing. And while she is not an "acceptable medical source" as defined by the SSA, her opinion is still one of a licensed therapist who provided care to Marshall for over a year. Accordingly on remand, the ALJ should also address Ms. Carmody's Disability Assessment Schedule separate from the form completed by Waggoner.

**D. Credibility Assessment**

Finally, Marshall argues the ALJ's credibility determination was insufficient. The ALJ must engage a two-step process for evaluating the claimant's symptoms. First, the ALJ must determine whether the claimant has established a medically determinable impairment which could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). If such an impairment exists, the ALJ assesses the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit his ability to do basic work activities. 20 C.F.R. § 404.1529(c). Whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of the symptoms are not substantiated by objective medical evidence, the ALJ must consider the claimant's daily activities; the location, duration, frequency, and intensity of his symptoms; the precipitating and aggravating factors; the type, dosage, effectiveness, and side effects

of any medication he takes or has taken to alleviate the symptoms; other treatment; and any other factors concerning his functional limitations and restrictions. *Id.* An ALJ's credibility determinations are entitled to special deference. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

At the first step of the sub-analysis, the ALJ found that Marshall's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." R. 25. Next, the ALJ found that Marshall's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons [given]." *Id.*

In this case, the ALJ gave several reasons for concluding that the evidence of record does not fully substantiate Marshall's allegations of disabling functional limitations. The ALJ noted that Marshall's medical records indicate general stability of mental functioning, with only mild or moderate limitations. R. 25. The ALJ also found that Marshall improved his academic performance throughout school. *Id.* Dr. Castillo opined in July 2013 that Marshall was unable to live independently, but the ALJ noted that subsequent treatment records indicated improved functioning through calendar management and performing typical activities of daily living. R. 33. Finally, the ALJ discussed Marshall's recent work activity as a kennel assistant for his family's business and his eight-week part-time employment at St. Vincent de Paul. *Id.*

Marshall argues the ALJ's analysis is nevertheless deficient because the ALJ provided a boilerplate credibility conclusion without justification. Marshall argues that his work experience bolsters his credibility in regard to his claim of total disability rather than diminishes it. The ALJ noted that Marshall "was able to perform significant work activity during [2013], both for his family's business and working part time for St. Vincent de Paul, suggestive of his ability to perform

22

typical activities of daily living." R. 32 (internal citations omitted). Marshall notes, however, that his work at the dog kennels was for only a few hours a day and under the watchful supervision of his mother and, like the eight-week supervised work experience through DVR, hardly constitutes evidence that he is able to hold a full-time job. He also argues, based on his mother's testimony, that the ALJ ignored the evidence that clearly showed he was unable to hold employment.

Ultimately, the ALJ's credibility determination appears to have turned on his assessment of Marshall's impairments and their functional limitations. Marshall had not demonstrated an ability to hold down a full-time job because he had never done so. On the other hand, he had demonstrated the ability to perform work-related tasks, and there are no physical obstacles to his holding employment as far as the record shows. The crucial question is whether he can perform a job within the RFC determined by the ALJ on the sustained basis needed to hold full-time employment. If his mother's description of his limitations was accurate, he probably could not do so. The difficulty is making the distinction between what a person cannot do and what a person does not choose to do. What a person does is not necessarily a measure of what the same person is capable of doing. Here, the ALJ reasonably concluded from his assessment of Marshall's RFC and what he clearly was able to do that he was capable of holding a full-time job, even though he had never done so. He likewise concluded that the fact that Marshall spent his days watching television and playing video games did not mean he was not capable of doing more. For the reasons explained above, the ALJ will be reassessing some of the evidence upon which the RFC determination was made. In the event his determination of Marshall's RFC changes, then a reassessment of Marshall's credibility will no doubt be required. Given the RFC the ALJ arrived at in the first instance, however, I do not find any error.

23

**CONCLUSION**

For the reasons given above, the decision of the Commissioner is **REVERSED** and the case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g) (sentence four). On remand, the ALJ should evaluate the medical opinion evidence of Dr. Smet, including the scores of the IQ tests she administered; re-evaluate the other medical opinions in accordance with 20 C.F.R. § 404.1527(c); and if a different RFC is determined, make a more detailed credibility determination addressing Marshall's daily activities. The clerk is directed to enter judgment accordingly.

Dated this   24th   day of March, 2017.

       s/ William C. Griesbach
      William C. Griesbach, Chief Judge
      United States District Court

24